This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-37739**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**LONDON WORD,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cristina T. Jaramillo, District Judge**

Hector H. Balderas, Attorney General
Emily Tyson-Jorgenson, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**MEDINA, JUDGE.**

**{1}** Defendant London Word appeals his convictions for possession of a deadly weapon by a prisoner, in violation of NMSA 1978, Section 30-22-16 (1986), and tampering with evidence, in violation of NMSA 1978, Section 30-22-5 (2003). Defendant raises three issues on appeal: (1) his convictions violate double jeopardy; (2) there was insufficient evidence to support his convictions; and (3) the district court abused its discretion in admitting testimony contrary to the best evidence rule. We affirm.

## BACKGROUND

**{2}** During the relevant time period, Defendant occupied a single-person cell at the Metropolitan Detention Center (MDC) in Bernalillo County. On March 25, 2017, correctional officers searched his cell and found a six-inch long metal rod, sharpened on one end with a sticky black substance on one side, inside an air vent. The State charged Defendant with possession of a deadly weapon by a prisoner and tampering with evidence. A jury found Defendant guilty of both crimes.

**{3}** During sentencing, defense counsel argued that both convictions were based on unitary conduct and thus double jeopardy required the tampering conviction be vacated. Referring to the jury instructions, the State responded that double jeopardy did not apply because each conviction was based on "two separate and distinct acts." The district court denied Defendant's motion explaining that under the jury instructions, the two crimes "require[ed] two separate intents for purposes of completing both actions." This appeal followed.

**{4}** Because this is a memorandum opinion and the parties are familiar with the facts and procedural history of this case, we reserve further discussion of specific facts where necessary to our analysis.

## DISCUSSION

### Double Jeopardy

**{5}** Defendant argues that his convictions for possession of a deadly weapon by a prisoner and tampering with evidence violate double jeopardy because they arise from "unitary conduct for which the [L]egislature did not intend separate punishments." The State counters that assuming Defendant's conduct was unitary, Defendant's convictions do not violate double jeopardy because the Legislature intended separate punishments for each offense.

**{6}** We review double jeopardy claims de novo. *See State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747 ("A double jeopardy challenge is a constitutional question of law which we review de novo."). "[D]ouble jeopardy protects against both successive prosecutions and multiple punishments for the same offense." *State v. Contreras*, 2007-NMCA-045, ¶ 19, 141 N.M. 434, 156 P.3d 725 (internal quotation marks and citation omitted). Defendant raises the latter type—multiple punishments for the same offense. Multiple punishment cases are classified in one of two ways: "double description cases in which a single act results in multiple charges under different criminal statutes;" and "unit of prosecution cases in which an individual is convicted of multiple violations of the same criminal statute." *State v. Gallegos*, 2011-NMSC-027, ¶ 31, 149 N.M. 704, 254 P.3d 655 (alteration, internal quotation marks, and citation omitted). Because Defendant asserts that unitary conduct resulted in multiple convictions under different statutes, we apply the double-description analysis.

**{7}**      In analyzing a double-description claim, we apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223. First, we determine whether the conduct underlying the offenses is unitary, that is, whether the same conduct violates both statutes. *Id.* "If the conduct is not unitary, there is no double jeopardy violation." *State v. Lucero*, 2015-NMCA-040, ¶ 21, 346 P.3d 1175. If, however, the conduct is unitary, we then look to the statute "to determine whether the Legislature intended to create separately punishable offenses." *Id.* (alteration, internal quotation marks, and citation omitted).

## A.     Defendant's Convictions for Possession of a Weapon by a Prisoner and Tampering With Evidence Were Based on Unitary Conduct

**{8}**      Defendant argues that his conviction for tampering with evidence violates double jeopardy because the State relied on the same evidence to prove both constructive possession of a weapon by a prisoner and tampering, i.e. "possession of a shank in the vent in his jail cell." When determining whether conduct is unitary, "we consider such factors as whether acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and the defendant's goals for and mental state during each act." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104. The discovery of the shank inside the air vent in Defendant's single-person cell lead to the charges in this case and provided the factual basis supporting each of Defendant's convictions.

**{9}**      Because there is no evidence of any intervening events or significant separation of time or physical distance between Defendant's possession of the shank in the air vent of his cell and his concealment of it there, we conclude that the conduct in this case was unitary. *See Lucero*, 2015-NMCA-040, ¶ 22 (considering in part whether the conduct underlying the offenses were close in time and space, their similarity, the sequence in which they occurred, and whether other events intervened). Having determined that Defendant's conduct was unitary, we turn to the second prong of our double-description analysis and determine whether the Legislature intended to create separately punishable offenses for the same conduct. *Franco*, 2005-NMSC-013, ¶ 11.

## B.     Possession of a Weapon by a Prisoner and Tampering With Evidence May Be Charged Together

**{10}**    "The test for determining whether more than one act has occurred was never intended to be the sole test for determining whether the Legislature intended to punish conduct under more than one statute." *Id.* ¶ 12. Therefore, "[t]o determine legislative intent, we look first to the language of the statute." *State v. Silvas*, 2015-NMSC-006, ¶ 11, 343 P.3d 616. Section 30-22-16 defines the crime of possession of a deadly weapon by a prisoner as "any inmate of a penal institution, reformatory, jail or prison farm or ranch possessing any deadly weapon or explosive substance." Section 30-22-5(A) on the other hand, defines the crime of tampering with evidence as "destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the

apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another."

**{11}** Because neither the possession of a weapon by a prisoner nor the tampering with evidence statute expressly provide for multiple punishments, we "apply the *Blockburger* test to the elements of each statute." *Swafford*, 1991-NMSC-043, ¶ 30. "Under *Blockburger* [*v. United States*, 284 U.S. 299 (1932)], the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Swick*, 2012-NMSC-018, ¶ 12 (internal quotation marks and citation omitted).

**{12}** "If [the *Blockburger* analysis] establishes that one statute is subsumed within the other, the inquiry is over and the statutes are the same for double jeopardy purposes— punishment cannot be had for both." *Swafford*, 1991-NMSC-043, ¶ 30. Conversely, "[i]f one statute requires proof of a fact that the other does not, then the Legislature is presumed to have intended a separate punishment for each statute without offending principles of double jeopardy." *Silvas*, 2015-NMSC-006, ¶ 12. "That presumption, however, is not conclusive and it may be overcome by other indicia of legislative intent, which may be gleaned from statutory schemes by identifying the particular evil addressed by each statute; determining whether the statutes are usually violated together; comparing the amount of punishment inflicted for a violation of each statute; and examining other relevant factors." *State v. Jackson*, 2020-NMCA-___, ¶ 36, ___ P.3d ___ (No. A-1-CA-36400, Feb. 26, 2020) (alteration, internal quotation marks, and citations omitted), *cert. denied*, 2020-NMCERT-___ (No. S-1-SC-38203, June 9, 2020).

**{13}** However, when a statute is vague and unspecific or written with many alternatives, we apply a modified version of the *Blockburger* test. *See State v. Gutierrez*, 2011-NMSC-024, ¶ 48, 150 N.M. 232, 258 P.3d 1024 (adopting "a modified version of the *Blockburger* test for double jeopardy claims involving statutes that are 'vague and unspecific,' in addition to those that are 'written with many alternatives.' " (internal quotation marks and citation omitted)). Under the modified *Blockburger* test, "we no longer apply a strict elements test in the abstract; rather, we look to the state's trial theory to identify the specific criminal cause of action for which the defendant was convicted, filling in the case-specific meaning of generic terms in the statute when necessary." *State v. Serrato*, 2020-NMCA-___, ¶ 16, ___ P.3d ___ (No. A-1-CA-36381, Feb. 17, 2020) (internal quotation marks and citation omitted). Hence, instead of analyzing the "statute in the abstract, we look at the legal theory of the offense that is charged" when comparing the elements of the statute. *Gutierrez*, 2011-NMSC-024, ¶ 58 (internal quotation marks and citation omitted).

**{14}** To determine the State's legal theory, we consider "such resources as the evidence, the charging documents, and the jury instructions." *State v. Montoya*, 2013-NMSC-020, ¶ 49, 306 P.3d 426. "Where neither the indictment nor the jury instructions shed any light on the state's trial theory, and/or to confirm our understanding of the state's theory, we may also look to the state's closing argument for evidence of the specific factual basis supporting its theory." *State v. Luna*, 2018-NMCA-025, ¶ 10, 458

P.3d 457 (alterations, internal quotation marks, and citation omitted). "By doing this, we may properly identify the appropriate 'provisions' for comparison that are at the heart of the *Blockburger* test." *Id.*

**{15}** Both the possession of a weapon by a prisoner and tampering with evidence statutes, as well as the indictment and jury instructions indicate that each crime requires proof of facts which the other does not. The possession of a weapon by a prisoner statute, indictment, and jury instructions required proof that: (1) "[D]efendant was in custody or confinement at [MDC];"[1] and (2) "[D]efendant was in possession of a [six-inch] long metal rod with a sharpened end [and] that [a six-inch] long metal rod with a sharpened end is a deadly weapon only if [the jury finds] that if used as a weapon, a [six-inch] long metal rod with a sharpened end could cause death or great bodily harm[,]" *see* § 30-22-16; UJI 14-2254 NMRA, facts not required for tampering with evidence. The tampering with evidence statute, indictment, and jury instruction, required proof that: Defendant "hid or placed the [six-inch] long metal rod with a sharpened end into an air vent" and Defendant "intended to prevent [his] apprehension, prosecution or conviction for [p]ossession of a [w]eapon by a [p]risoner." *See* § 30-22-5; UJI 14-2241. Each of these factual elements are distinct from those required for possession of a weapon by a prisoner.

**{16}** Defendant contends, however, that because the State's theory of possession of a deadly weapon relied on constructive possession, under the jury instructions in this case, "[t]he entire crime of possession is captured in the actus reus of the tampering charge (hid or placed) and thus subsumed into the tampering conviction." We disagree. The grand jury indictment and jury instructions for constructive possession of a weapon by a prisoner do not require a finding that Defendant "hid or placed" the sharpened metal rod in the air vent in order to prevent apprehension, prosecution or conviction of a crime. Rather, possession of a weapon by a prisoner only required the jury to find that Defendant, while in the lawful custody of MDC, possessed the sharpened metal rod discovered in the air vent of his single-person cell, because "he [knew] what and [where] it [was] and he exercise[d] control over it." The State's legal theory for the constructive possession of a weapon by a prisoner charge relies not only on Defendant's placement of the weapon in the air vent, but as the State argued during closing, also on Defendant's exclusive occupancy of the cell.

**{17}** With regard to the crime of tampering with evidence, the State argued during closing that Defendant "placed [the deadly weapon] in the [air] vent to avoid prosecution for himself for having contraband[,]" demonstrating that its legal theory for tampering with evidence relied on Defendant's specific intent to avoid prosecution. *See Silvas*, 2015-NMSC-006, ¶¶ 19-20 (turning to the state's closing argument as evidence of the state's legal theory in applying the modified *Blockburger* analysis). Thus, although Defendant's unitary act of placing the weapon in the air vent supports both the State's theory of constructive possession and tampering with evidence, the State's theory for tampering with evidence additionally relied on Defendant's mental state, that is, his specific intent or objective behind hiding or placing the weapon in the air vent, which

---

[1]Defendant and the State stipulated that Defendant was in custody or confinement at MDC.

was to avoid apprehension, prosecution, or conviction. *Cf. State v. Guerra*, 2012-NMSC-027, ¶¶ 11-12, 284 P.3d 1076 (recognizing that tampering with evidence requires evidence of a defendant's specific intent to tamper).

**{18}** As the district court observed, the possession of a weapon by a prisoner charge, requiring intent to possess the weapon, and the tampering with evidence charge, requiring a specific intent to prevent apprehension, prosecution, or conviction, require two different mental states. *Compare* § 30-22-5, *with* § 22-22-16. Rather than addressing the distinct mental states for each crime, Defendant cites to *State v. Benally*, 2019-NMCA-048, 448 P.3d 592, asserting that the "evidence only established one act of possession in a hidden location . . . with the same mental state and purpose[.]"

**{19}** Our review of *Benally* indicates that the double jeopardy issue in that case concerned multiple convictions under the same general intent crime of possession of a deadly weapon by a prisoner. *Id.* ¶ 1. In contrast, here, Defendant was charged and convicted of a general intent crime—possession of a deadly weapon—and a specific intent crime—tampering with evidence. *See Guerra*, 2012-NMSC-027, ¶ 12 (stating that our Supreme Court "has previously recognized that the crime of tampering with evidence requires evidence that the defendant specifically intended to tamper with evidence"); *State v. Baca*, 1997-NMSC-059, ¶ 51, 124 N.M. 333, 950 P.2d 776 ("In New Mexico, specific intent is the intent to do a further act or achieve a further consequence." (internal quotation marks and citation omitted)). Thus, despite the fact that the weapon's location in the air vent of Defendant's single-person cell is evidence of Defendant's knowledge and control over the weapon and that he intended to hide the weapon to avoid prosecution, it does not change the fact that each charge required proof of facts that the other did not, including different mental states. These distinctions raise a presumption that the Legislature intended a separate punishment for the violation of each statute. *See Jackson*, 2020-NMCA-___, ¶ 48.

**{20}** We next consider whether the particular evil sought to be addressed by each offense is distinct. *See Swafford*, 1991-NMSC-043, ¶ 32 ("Statutes directed toward protecting different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments."). The purpose of Section 30-22-16 "is to protect inmates and officers from assaults with dangerous weapons perpetrated by armed prisoners." *State v. Baca*, 1992-NMSC-055, ¶ 16, 114 N.M. 668, 845 P.2d 762. In contrast, Section 30-22-5, seeks to preserve evidence for trial, *Franco*, 2005-NMSC-013, ¶ 18, and punish "those who try to frustrate the criminal justice system by obstructing access to evidence of a crime." *State v. Radosevich*, 2018-NMSC-028, ¶ 10, 419 P.3d 176. The focus of the tampering with evidence statute is not to protect inmates and officers from assaults with dangerous weapons but instead to prevent interference with criminal investigations by preserving evidence and punishing those who seek to hide or destroy evidence of a crime. The distinct social harms addressed in these two statutes suggest that the Legislature intended to punish the two crimes separately. We next examine whether these crimes are likely to be committed together.

**{21}** Defendant contends the majority of possession of weapon by prisoner cases will involve hidden weapons and asserts that the two statutes in this case are usually violated together. The State counters that the crimes at issue "are not necessarily violated together because possession can be committed without tampering and, similarly, tampering can be committed without actually possessing the [weapon]."

**{22}** In support of his argument Defendant directs our attention to *State v. Almeida*, in which we concluded that "the [L]egislature did not intend to punish a defendant for possession of a controlled substance and possession of [drug] paraphernalia when the paraphernalia [charge] consists of only a container that is storing a personal supply of the charged controlled substance." 2008-NMCA-068, ¶ 21, 144 N.M. 235, 185 P.3d 1085. Defendant's reliance on *Almeida* is unpersuasive because, as discussed in that case, use of a small container to hold a personal supply of drugs is inherent in the crime of possession of a controlled substance. *Id.* ¶ 19. For that reason both crimes are usually committed together. *Id.* ¶ 17. Conversely, we do not believe that tampering with evidence is inherent in the crime of possession of a weapon by a prisoner. While some possession of weapons by a prisoner charges may arise through the discovery of hidden weapons, others may arise during assaults, the very evil sought to be addressed by the statute. *See Baca*, 1992-NMSC-055, ¶ 16; *see also* NMSA 1978, § 30-22-17 (1963) (defining assault by prisoner).

**{23}** Finally, we look to the quantum of punishment as it is also probative of legislative intent to punish. *See Swafford*, 1991-NMSC-043, ¶ 33 (stating that "[w]here one statutory provision incorporates many of the elements of a base statute, and extracts a greater penalty than the base statute, it may be inferred that the [L]egislature did not intend punishment under both statutes."). Here, violations of the two statutes result in differing degrees of punishment, compare Section 30-22-16, a second-degree felony carrying a sentence of up to nine years, with Section 30-22-5, a fourth-degree felony, carrying a sentence of up to eighteen months. Although *Swafford* provided that different degrees of punishment may indicate a legislative intent against separate punishments, "this Court and our Supreme Court have previously noted that a difference in the quantum of punishment alone is insufficient to overcome other indicia of legislative intent." *State v. Caldwell*, 2008-NMCA-049, ¶ 19, 143 N.M. 792, 182 P.3d 775. On balance, application of the principles used to determine legislative intent support the presumption that the legislature intended separate punishment for violation of Section 30-22-16 and Section 30-22-5. Thus, we conclude that Defendant's convictions do not violate double jeopardy.

### Sufficiency of the Evidence

**{24}** Defendant next argues that his convictions are not supported by substantial evidence. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks and citation omitted). We "view the evidence in the light most favorable to the guilty verdict,

indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. The question on appeal is whether the jury's "decision is supported by substantial evidence, not whether the [fact-finder] could have reached a different conclusion." *In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15, 121 N.M. 562, 915 P.2d 318. We therefore disregard all evidence and inferences that support a different result. *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

## A.      Sufficient Evidence Supports Defendant's Conviction for Possession of a Weapon by a Prisoner

**{25}**      Defendant argues that his conviction for possession of a weapon by a prisoner is not supported by substantial evidence because he "did not have *exclusive* control over the air vent or jail cell where guards found the shank[.]" Specifically, Defendant contends that because "[n]o one testified that they saw [him] with the [shank] and the State did not present fingerprint evidence or other forensic evidence tying [him] to the [shank,] evidence that he was assigned to the "single-man cell for a few months" was insufficient to prove constructive possession because the State failed to present evidence that the shank was not left in the air vent by a prior inmate. We disagree.

**{26}**      Section 30-22-16 defines the crime of possession of a weapon by an inmate in relevant part as:

> Possession of a deadly weapon . . . by prisoner in lawful custody consists of any inmate of a penal institution, reformatory, jail or prison farm or ranch possessing any deadly weapon[.]

The only element at issue in this appeal is that of possession.

**{27}**      Because the weapon was not found on Defendant's person but instead inside the air vent located in Defendant's cell, this case rests on constructive, not actual possession. "[C]onstructive possession is a legal fiction used to expand possession and include those cases where the inference that there has been possession at one time is exceedingly strong." *State v. Barber*, 2004-NMSC-019, ¶ 22, 135 N.M. 621, 92 P.3d 633 (internal quotation marks and citation omitted). "Constructive possession exists when the accused has knowledge of the prohibited items and exercises control over them." *Benally*, 2019-NMCA-048, ¶ 9 (alteration, internal quotation marks, and citation omitted). "While knowledge of the presence of [the prohibited items] may be inferred where exclusive possession of the premises is shown, where exclusive possession is not shown, additional evidence is required to support such an inference." *State v. Becerra*, 1991-NMCA-090, ¶ 14, 112 N.M. 604, 817 P.2d 1246. In the end we "must be able to articulate a reasonable analysis that the fact-finder might have used to determine knowledge and control." *State v. Garcia*, 2005-NMSC-017, ¶ 13, 138 N.M. 1, 116 P.3d 72 (alteration, internal quotation marks, and citation omitted).

**{28}** Viewing the evidence in the light most favorable to the guilty verdict, we conclude that sufficient evidence supports a reasonable inference that Defendant had knowledge of and control over the weapon. Officer Steven Nez testified that before moving an inmate into a single-person cell, officers on duty at MDC perform an exhaustive search of the cell, including searching air vents, for damage or anything in the cell that may harm the inmate. Sergeant Keith Brandon and Officer Nez both testified that Defendant was assigned to a single-person cell beginning on December 28, 2016. Additionally, officers in Defendant's cell unit perform sixteen random cell searches per day resulting in a search of each cell every four days. These searches include the same areas searched before occupancy assignments.

**{29}** Sergeant Brandon testified that he did not have "first-hand, on-sight knowledge" that officers performed a search of Defendant's single-person cell before he was assigned occupancy of the cell and could not personally confirm that every subsequent search of Defendant's cell occurred. However, he testified that searches are standard procedure and that a supervisor reviews records of searches conducted during each shift to ensure they are completed. A weapon was located in an air vent in Defendant's cell on March 25, 2017. From this evidence a reasonable jury could conclude that: (1) prior to placing Defendant into his single-person cell MDC officers followed standard procedure and performed a thorough search of the cell during which no weapon was located; (2) pursuant to standard operating procedures, officers searched Defendant's cell every four days; and (3) until March 25, 2017, no weapon was located in Defendant's cell.

**{30}** Sergeant Brandon also testified that only the inmate assigned to the cell and officers assigned to work with the inmate may enter single-person cells. Further, when an inmate leaves his cell, the door is secured behind the inmate. From this evidence a reasonable jury could conclude that aside from correctional officers, Defendant had exclusive access to and control of his cell.

**{31}** Although the inmate handbook precludes inmates from storing items in air vents, according to Officer Nez, air vents are a common place to hide items. During the March 25, 2017 search of Defendant's cell, Officer Nez located the weapon inside an air vent in Defendant's cell. The air vent was not positioned "very high [in the cell]" and was "within reaching distance." Sergeant Brandon explained that because of the vent system's configuration, it is impossible for another inmate to have placed the weapon in Defendant's vent from another cell. The weapon had a black sticky substance on one end which, according to Sergeant Brandon, is used to hide objects such as razor blades, drugs, or in this case a shank. Sergeant Brandon explained that the sticky substance on the shank enabled the shank to stick to the very edge of the air vent grate with no chance of falling in and becoming inaccessible.

**{32}** Evidence of Defendant's exclusive occupancy of his single-person cell—restricted to access by only Defendant and officers—in addition to the air vent's arms-reach location and sticky substance found on the weapon, supports a reasonable inference that Defendant had knowledge of where the weapon was located and that he

exercised control over it. *Cf. State v. Montoya*, 1973-NMCA-060, ¶¶ 4-5, 85 N.M. 126, 509 P.2d 893 (holding that sufficient evidence supported constructive possession of heroin where the defendant occupied a motel room for six days even though people were seen entering and leaving the room before the search began). Considering this evidence in a light most favorable to the guilty verdict, we conclude that sufficient evidence supports Defendant's constructive possession of the weapon.

**{33}** Defendant argues that because officers also had access to Defendant's cell, he did not have exclusive possession. To the extent Defendant suggests the officers may have planted the weapon in the air vent, under our standard of review we determine whether the jury's "decision is supported by substantial evidence, not whether the [fact-finder] could have reached a different conclusion." *In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15. Defendant also challenges the sufficiency of the evidence by arguing that Sergeant Brandon could not confirm that previous searches of Defendant's cell occurred. However, Sergeant Brandon testified that regular searches of cells in Defendant's unit were standard procedure. The jury was free to weigh this testimony and infer that MDC officers followed standard procedures and searched Defendant's cell on a regular basis. *See State v. Ryan*, 2006-NMCA-044, ¶ 20, 139 N.M. 354, 132 P.3d 1040 (It is the fact[-]finder's prerogative to weigh the evidence and to judge the credibility of the witnesses."). We will not second-guess the fact-finder nor will we reweigh the evidence. *State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 ("New Mexico appellate courts will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury." (alterations, internal quotation marks, and citation omitted)).

**B.      Sufficient Evidence Supports Defendant's Tampering With Evidence Conviction**

**{34}** With regard to his tampering with evidence conviction, Defendant contends "the State failed to prove that [he] hid or placed the [shank] in the [air] vent with the required intent." "Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30-22-5(A). Viewing the evidence in a light most favorable to the guilty verdict, we conclude that sufficient evidence supports Defendant's conviction for tampering with evidence.

**{35}** As we previously concluded, the jury could reasonably infer Defendant placed the weapon in the air vent in his cell from the testimony that prior to single-cell occupancy assignments, MDC officers thoroughly search the cell, the cells are subject to random searches thereafter, and aside from the occupant, the cell is accessible only by officers. With regard to intent, sufficient evidence was presented from which the jury could infer that Defendant acted with an intent to prevent his apprehension, prosecution or conviction for the crime of possession of a weapon by a prisoner. *State v. Silva*,

2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 (identifying tampering with evidence as a specific intent crime).

{36}    Intent to tamper with evidence can be inferred from circumstantial evidence. *See State v. Schwartz*, 2014-NMCA-066, ¶ 36, 327 P.3d 1108 (stating that the jury could infer the defendant's intent to tamper with evidence from evidence, inter alia, that the defendant owned a blue air mattress and sheets and that the victim's body was found in a nearby alley wrapped in a blue air mattress and sheets). Testimony in this case revealed that air vents are a common place to hide items and that inmates are aware that placing items in air vents is prohibited. In addition, there was testimony explaining that inmates use sticky substances, such as the substance found on the weapon in Defendant's cell, to keep objects from falling down the air vent. This evidence, viewed in the light most favorable to the verdict, was sufficient to permit the jury to infer Defendant intended to prevent his apprehension, prosecution, or conviction for possession of a deadly weapon by a prisoner by placing the weapon in the air vent of his cell—thereby hiding it—to prevent discovery.

{37}    Defendant argues that because officers search air vents routinely, the weapon's placement in the air vent only minimally delayed its discovery and therefore Defendant's actions do not evince an intent to avoid apprehension, prosecution, or conviction. In support of his position, Defendant cites to *State v. Roybal*, 1992-NMCA-114, 115 N.M. 27, 846 P.2d 333. The facts in *Roybal*, are distinguishable, and we find Defendant's reliance on *Roybal* unpersuasive. In *Roybal*, officers observed the defendant participated in what they believed to be a narcotics transaction. *Id.* ¶ 7. The officers approached and identified themselves to the defendant at which point the defendant dropped heroin onto the ground. *Id.* In reviewing the sufficiency of the evidence supporting the defendant's tampering with evidence conviction, this Court concluded that the word "place" in the jury instruction, indicated "an act of putting evidence in a particular place" and that although the "[d]efendant might have tried to conceal the evidence by dropping it to the ground, there was no evidence that he acted to 'place' the heroin in a particular location." *Id.* ¶¶ 24, 30. We further held that while the defendant's actions indicated an immediate reaction to the predicament in which he found himself, they did not prove beyond a reasonable doubt that he formed a specific intent to thwart the officers. *Id.* ¶ 29.

{38}    Unlike the facts in *Roybal*, Defendant did not merely abandon evidence in police presence but instead placed the weapon in a particular location, in such a manner that it was hidden from plain view. Therefore Defendant's actions support a reasonable inference that he deliberately placed the weapon in the air vent with the specific intent to conceal his possession of a deadly weapon by a prisoner.

{39}    Defendant also cites multiple cases from other jurisdictions for the proposition that when a defendant does nothing to prevent the recovery of the item, a conviction for tampering with evidence cannot be sustained. However, we have reviewed these cases and find them factually distinguishable. Like *Roybal*, all but one of the cases address tampering or obstruction charges in the specific context of abandonment of evidence in

the presence of police officers.[2] *See State v. Jones*, 2007-1052 (La. 6/3/08); 983 So. 2d 95, 99, 102 (considering whether "dropping . . . marijuana to the ground in the presence of the police constitute[s] obstruction of justice or attempted obstruction of justice" and concluding that it did because "success is not required, only specific intent and the requisite act"); *State v. Lasu*, 768 N.W.2d 447, 449-450 (Neb. 2009) (reviewing sufficiency of the evidence for tampering with evidence where the defendant discarded a large bag of marijuana on top of a bin after being confronted and followed by police); *Anderson v. State*, 123 P.3d 1110, 1112, 1117 (Alaska 2005) (concluding that the act of "tossing" a handgun and ammunition from a car window while being pursued by the police did not constitute the crime of evidence tampering); *In re M.F.*, 734 N.E.2d 171, 178-179 (Ill. 2000) (concluding that the element of concealment was not present where accused discarded bags of drugs in view of a police officer shining a flashlight on him); *People v. Comage*, 946 N.E.2d 313, 319 (Ill. 2011) (holding that the act of throwing a crack pipe and push rod while being chased by police and in their presence did not amount to concealment within the meaning of the obstruction of justice statute). Unlike the facts in these cases, Defendant did not discard the weapon in the presence of guards but instead concealed it in the air vent of his cell.

**Sergeant Brandon's Testimony Did Not Violate the Best Evidence Rule**

**{40}** Finally, Defendant argues that the district court abused its discretion by allowing Sergeant Brandon to testify "that he reviewed surveillance video footage to make sure generally that officers were doing cell searches[,]" because the testimony violated the best evidence rule. We disagree.

**{41}** "Rulings admitting or excluding evidence are generally reviewed for an abuse of discretion." *State v. Campbell*, 2007-NMCA-051, ¶ 9, 141 N.M. 543, 157 P.3d 722. The district court abuses its discretion when its ruling is "obviously erroneous, arbitrary and unwarranted" or "clearly against the logic and effect of the facts and circumstances before the court." *Id.* (internal quotation marks and citation omitted). "[T]he threshold question of whether the [district] court applied the correct evidentiary rule or standard is subject to de novo review on appeal." *State v. Torres*, 1999-NMSC-010, ¶ 28, 127 N.M. 20,976 P.2d 20. Additionally, "[a district] court abuses its discretion when it exercises its discretion based on a misunderstanding of the law." *State v. Lente*, 2005-NMCA-111, ¶ 3, 138 N.M. 312, 119 P.3d 737.

---

2The lone case cited by Defendant not involving abandonment of evidence in the presence of police is *Mullins v. Commonwealth*, 350 S.W.3d 434 (Ky. 2011). In *Mullins* the evidence at issue was never recovered, however, the prosecution charged the defendant with tampering with evidence arguing that a witnesses saw the defendant flee the scene of the crime with a gun. *Id.* at 442. The court in *Mullins* concluded that removal of the gun was a continuation of the defendant's act of murder and therefore not sufficient to also serve as grounds for tampering. *Id.* at 443. The court also concluded that conviction of tampering based on concealment of the gun was not permissible solely because the weapon was never found and where "there is no proof that the defendant acted with the intent to prevent evidence from being available at trial." *Id.* at 444. Unlike the facts in *Mullins*, Defendant was not charged and convicted of tampering based on removal of evidence, but rather the concealment of evidence.

**{42}** The best evidence rule provides that "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a statute provides otherwise." Rule 11-1002 NMRA.

**{43}** During cross-examination, Sergeant Brandon affirmed that as part of his investigation he reviewed surveillance footage from the day the officers found the weapon in Defendant's cell. Defense counsel also asked if—while viewing the video— Sergeant Brandon witnessed any interaction between the inmates, to which Sergeant Brandon answered "no." The State questioned Sergeant Brandon on re-direct during which the following colloquy took place.

> State: Do you routinely see officers searching the cells as they're supposed to?
>
> Sergeant Brandon: Yes. We are on a random basis we are required to look through video to see if the officers are actually doing their searches. This verifies the paperwork that we get at the end of our shift to say that they have done their cell searches. You randomly pick one or two of those cells that they searched and were supposed to review the footage to actually. . . [witness is cut off].
>
> Defense: I'm going to object, may we approach?

Defendant argued that Sergeant Brandon's testimony describing search reports made by officers and surveillance videos reviewed by supervising officers was contrary to the best evidence rule. The State responded that Sergeant Brandon's testimony did not discuss the content of the records or videos but only his experience and requirements of his job. The district court overruled the objection and advised the State to keep its questions narrowed to Sergeant Brandon's job duties.

**{44}** Our review of Sergeant Brandon's testimony reveals that he only described his duty to review videos generally, stating that he did so in order to verify records of reported searches and that he did not discuss the specific content of any videos or records. Therefore the best evidence rule did not apply to his testimony. *See State v. Landlee*, 1973-NMCA-143, ¶ 10, 85 N.M. 726, 516 P.2d 697 (concluding that the best evidence rule did not apply where "[t]he state did not attempt to prove the contents of any document"). To the extent Sergeant Brandon briefly addressed the content of the surveillance video on the day officers discovered the weapon in Defendant's cell, he did so in response to defense counsel's questioning. *See State v. Jim*, 2014-NMCA-089, ¶ 22, 332 P.3d 870) (observing that "[it] is well established that a party may not invite error and then proceed to complain about it on appeal"). Accordingly, we hold that the district court properly overruled Defendant's objection.

## CONCLUSION

**{45}** For the foregoing reasons, we affirm Defendant's convictions.

**{46}** IT IS SO ORDERED.

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**